McCullars *v.* State.

Opinion delivered March 2, 1931.

*A. B. Caplinger,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

BUTLER, J. About one o'clock in the afternoon of the 29th of March, 1930, the dead body of Agnew Mardis was found in a ditch beside the public road which ran from Harrisburg, Arkansas, to Bay Village, Arkansas, at a point about three miles south of Harrisburg in Poinsett County. There was one wound on the body made by a bullet which entered the head on the left side just below and slightly back of the left ear. There were no eye-witnesses to the killing.

The defendant was arrested in Williamson County, Texas, on or about the 10th day of April, 1930, returned to Arkansas, and tried in the circuit court charged with the murder of the deceased. The trial resulted in a verdict of guilty of murder in the first degree, and punishment fixed at imprisonment in the State Penitentiary for life. A motion for a new trial was filed in apt time, which was overruled, and judgment was entered according to the verdict, from which is this appeal.

The evidence which most nearly tends to connect the defendant with the commission of the crime is substantially as follows: The body of Mardis was discovered shortly after the murder. Several witnesses testified as to having seen Mardis at different times before the date of the homicide in company with a man whom they identified as the defendant. Two women testified that they had seen Mardis in company with the defendant at about seven o'clock on the morning of the day that he was killed. One of these stated that Mardis, in company with a man, came to her house and stayed about twenty min-

utes; that the man whom she afterward identified at the trial as the defendant, had a finger off the right hand. The other woman stated that the two came to her house about the same time and stayed about thirty minutes, and that after they left she saw them coming back by her house going south about 11 o'clock; that the man in company with Mardis had a heavy ridge or big vein across his eye which was very noticeable, and she identified the defendant as that man. Another witness by the name of Moore stated that he had bought some chickens from a man who was with Mardis in a car about eight o'clock on the morning of the day of the murder, but the witness was unable to identify the defendants as the man who was with Mardis at that time. Two other persons, however, who were present when the chickens were bought, testified that the defendant was the man with Mardis at that time.

The defendant was a stranger to these witnesses, and his identification was based on a comparison of the appearance of the defendant with the person whom they testified was in the company of Mardis on that day. One Joseph who testified that he had known the defendant for three or four years and had been introduced to him by Mardis, stated that he had bought chickens from the defendant and Mardis some months before the homicide, and had met the defendant on Wednesday before the killing on Saturday, and that at that time the defendant was driving a Baby Overland closed car; that he had seen the two together frequently. Another witness, Ogle, testified that he had known the defendant about fifteen years and had seen the defendant and Mardis together on Thursday or Friday night before the day Mardis was killed, and that he saw Mardis with three twenty dollar bills at that time. The witnesses who testified to having seen the defendant in company with Mardis on the day of the homicide stated that the two were riding together in a closed car. This was substantially all the testimony adduced on the part of the State.

A number of witnesses for defendant, John Minor and members of his family, testified that they, too, had seen Mardis in company with a stranger driving in a two-door Baby Overland car, and that they came to the house of John Minor on the morning of March 29, 1930; that both were under the influence of liquor, and the stranger with Mardis was described as being a square-built man with an unusually large scar running between his eyes nearly to the back of his head, and that this individual was not the same person as the defendant. Two other witnesses besides the members of the Minor family also testified as to having seen Mardis in company with a stranger on the morning of March 29th, and that, in their opinion, the defendant was not such person.

A number of other witnesses from Williamson County, Texas, testified that they were acquainted with the defendant, and that he had been continuously in that county working in a cafe in the Chapman Oil Field from the 18th or 20th of March down to, and including, the 10th or 11th of April, 1930, the day on which he was arrested. These witnesses testified that they saw the defendant frequently during the day, and that he worked continuously as a dishwasher and waiter in the cafe all of that time. One witness, a drilling contractor, engaged in drilling an oil well in that field, stated that he kept a log of the well and knew from that what he was doing each day; that the log showed that about eleven or twelve o'clock on the night of March 29, 1930, witness went to Lundy's Cafe to get something to eat, and defendant was then at that place and helped push a car some distance.

One witness, E. G. Edge, testified that he was the constable of the precinct in which Chapman Oil Field was located and spent nearly every day and well into the night in that vicinity attending to his duties as constable; that he received a telegram from Arkansas directing the arrest of a Charles McCullars, who was described in the telegram as a little low, dark complexioned fellow with a scar on his face. When witness received the telegram, he

read it in the presence of the defendant but did not arrest the defendant because he did not answer to the description, and because he knew that the defendant had been in the oil field working at the cafe before and at the time of the homicide; that the defendant knew of the receipt of the telegram by witness about nine o'clock at night, and the defendant remained on until the next day about twelve o'clock when the sheriff came over and placed him under arrest.

It will be seen that the testimony upon which the State relies for conviction is wholly circumstantial and, to connect the defendant with the commission of the crime, it is necessary to establish his identity as that of the stranger who was last seen in company with Mardis. Question of identity is one about which mistakes are not infrequently made, and there was a dispute among the witnesses as to whether or not the defendant was the person last seen in company with Mardis. This, together with the evidence of witnesses who testified to establish the alibi, might have made it doubtful whether the defendant was indeed the person last seen in company with Mardis, and, while the testimony may be sufficient to sustain the verdict, it is far from satisfactory.

After the verdict was rendered, and within the time prescribed by law, the defendant moved for a new trial on the ground, among other things, of newly discovered evidence. In the motion he alleged that he did not know that one John Hopkins knew anything about the case, and that he had used due diligence to obtain all of the evidence relating to the homicide, but had learned on the day after the verdict was returned that Hopkins was a material witness. At the hearing of the motion, Hopkins was introduced and testified that he lived in Poinsett County, on his own farm, and that on the morning of Saturday, March 29, 1930, he was returning from Harrisburg to his home about eleven o'clock, and at a point about three hundred yards from the place where the body of Mardis was afterward discovered he saw a car backed

into a gulley by the side of the road, and in this car was Mardis, whom he knew well, and another man who was unknown to him. Witness assisted them in getting their car out of the gulley and talked with both of them. He stated that the man in the car with Mardis called him to the car, and that he looked him full in the face and had an opportunity to, and did, closely observe him; that the man had a scar across his face as large as witness' finger and that "any one would notice that about the first time you looked into his face"; that witness would know the man again by that scar. When Charles McCullars was pointed out to the witness, in answer to a question as to whether or not he was the man with Mardis, the witness answered, "He don't look like the man to me. Of course, there has been a lot of talk, too, about such as that—that a man would change."

The court, in passing on the motion for a new trial, said: "I am sorry that this negro, John Hopkins, was not brought before the jury to testify. Here is a negro who has lived for many years in one community, who owns his own home and stands high in that community as an honest, reputable citizen, and whose reputation for honesty and truthfulness the sheriff of this county willingly and without hesitation says is good. * * * All the facts which have a material bearing on the case should be brought out, and the jury given the benefit of it. There is no way of knowing what effect this negro's testimony would have had on the jury or what weight the jury would have given it in this case. I am not satisfied with it. This negro, so far as the testimony shows, was the last person to see the deceased and the man who was with the deceased, and only a few moments and only about three hundred yards from the place where the killing took place. I again say that I am sorry that he was not given an opportunity to testify and the jury given the benefit of his testimony."

It is the position of the State that the testimony of John Hopkins was cumulative, that several witnesses,

members of the family of John Minor, had testified that the stranger in the car with Mardis had a large and prominent scar on his face such as the defendant did not have, and that the testimony of Hopkins was only to the same effect. It is true that Hopkins' testimony is cumulative in a sense, and yet Hopkins related facts about which no other witness testified—that a scar-faced stranger was in a car with Mardis on the morning of the homicide at a point about three hundred yards from where the body of Mardis was afterward discovered, and that he was with Mardis but a short time before the commission of the crime, and that the scar was so large it would be the first thing noticed about the individual. These additional facts rendered the testimony of the witness Hopkins original and not cumulative. That it was highly important, there can be no doubt. The identification made by the witnesses for the State was unsatisfactory and based upon observation more or less casual and shaken as this testimony was by contradictory testimony and that tending to establish the alibi, the jury might well have given great weight to the testimony of Hopkins, whose attention was especially called to Mardis' companion and the incident fixed in his memory by its close proximity in time and place to the tragedy. That the trial judge regarded this testimony as material and important is shown by his comments above set out, which were equivalent to a finding that the testimony of Hopkins was material and of such nature as might profoundly influence the mind of the jury. It is clear that the trial judge felt that the rights of the defendant had been greatly prejudiced by not having had an opportunity to examine Hopkins on the witness stand, and that, if this testimony had been produced, the verdict of the jury might have been different.

It is the duty of the trial judge, where it appears that the defendant has discovered important evidence in his favor since the verdict which he could not have before anticipated or obtained by the exercise of due diligence,

to grant a new trial. Subdiv. 6, § 3219, Crawford & Moses' Digest. In the case of *Twist* v. *Mullinix*, 126 Ark. 427, 190 S. W. 851, we held that, if the trial court finds and announces that the verdict of the jury is against the preponderance of the evidence on the material issue in the case, he must set aside such verdict, and, where he fails to do so, this court, on appeal, will reverse for a new trial. This rule was recognized and followed in *Mueller* v. *Coffman*, 132 Ark. 45, 200 S. W. 136, where, in overruling the motion for a new trial, the court said: "I must confess that the verdict as returned by the jury was somewhat of a surprise to the court; but, as there were disputed questions of fact for the determination of the jury, and though contrary to the judgment of the court as to what the verdict should have been, I do not deem it proper to disturb the verdict of the jury. I think, if you were to take Gordon (meaning Mr. Beauchamp, attorney for the plaintiff) to one side and ask him to make a confidential statement, he would doubtless admit that he won a lawsuit which he expected to lose." *Held* this an expression of the view that the verdict of the jury was against the preponderance of the evidence, and the court erred in not granting a new trial. See also *Spadra Creek Coal Co.* v. *Calahan*, 129 Ark. 408, 196 S. W. 477.

The rule announced in these cases is applicable to the instant case. We can see no difference in principle where a trial judge clearly indicates that, in his opinion, the verdict of the jury is against the preponderance of the evidence and refuses to grant a new trial, from a declaration by him tantamount to a finding that material and important evidence has been discovered by the defendant after the verdict is rendered; for it would be equally his duty to grant a new trial in either case. As we have said, the statements made by the trial judge were equivalent to an express finding that the defendant had brought himself within subdiv. 6 of § 3219, *supra,* and, having done so, when he failed to grant the motion for a new trial, he failed in his duty. We have frequently held that it is the

province of the trial judge to promptly set aside a verdict of the jury when in his opinion such verdict is against the weight of the evidence, or where, for some other reason, there was not a fair and impartial trial, and when the trial judge surrenders this province he "destroys the integrity of the best system that thus far has been devised in this country.for the administration of justice."

We hold therefore that the trial court abused its discretion in failing to set aside the verdict of the jury, and its judgment will be reversed and the cause remanded for a new trial. It is so ordered.